410 F.Supp. 948 (1976)
UNITED STATES of America, Plaintiff,
v.
CITY OF ST. LOUIS et al., Defendants.
FIREFIGHTERS INSTITUTE FOR RACIAL EQUALITY et al., Plaintiffs,
v.
CITY OF ST. LOUIS et al., Defendants.
Civ. A. Nos. 74-200C(4), 74-30C(4).
United States District Court, E. D. Missouri, E. D.
April 9, 1976.
*949 *950 Forriss D. Elliott, Jack L. Koehr, City Counselor, Donald J. Stohr, U. S. Atty., St. Louis, Mo., for plaintiff.
John H. Goffstein, Clayton, Mo., James J. Gallagher, Assoc. City Counselor, St. Louis, Mo., for defendants.

MEMORANDUM
NANGLE, District Judge.
Plaintiffs brought these actions pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. §§ 1981 and 1983.
These cases were tried before the Court sitting without a jury. The Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, the stipulations of the parties, and being otherwise fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure:

FINDINGS OF FACT
1. Plaintiff, Firefighters Institute for Racial Equality, Inc. is a not-for-profit corporation, organized under the laws of the State of Missouri. Plaintiff, Preston Sims, is a black citizen of the United States, resident of the City of St. Louis, Missouri. Plaintiff Sims was denied employment by the Fire Department, based in part at least upon his failure to pass a written test which was given as a prerequisite for employment by the St. Louis Fire Department. Plaintiffs, George Baker, Robert D. Morgan, Robert Grady, Sherman George, George Redford Turner, Lawrence L. Britt, Vernon Ammons, Wendell H. Goins, Charles Gay, George E. Horne, William L. Young, Daniel S. Austin, Robert Anderson, John H. Harvey, Joseph P. Hughes, and Eugene Stanton are all black citizens of the United States, and residents of the City of St. Louis. All are presently employed by the St. Louis Fire Department. The Attorney General has brought suit on behalf of the United States.
2. Defendant City of St. Louis is a municipality incorporated pursuant to the laws of the State of Missouri and is a political subdivision of that State. Defendant Division of Fire and Fire Prevention is one division within the Department of Public Safety of the City of St. Louis. It operates all firefighting facilities of the City of St. Louis. Defendant Frank C. Cummings is the Acting Chairman of the Civil Service Commission of St. Louis. Defendants Fred Gould and Charles Marino are members of the Civil Service Commission. Defendant Joseph B. Clark is the Director of the Department of Public Safety of the City of St. Louis. Defendant Charles Kamprad is the successor to the originally named defendant Denis Broderick, who subsequently retired as Chief of the Fire Department. Defendant R. Elliott Scearce is the Director of the Department of Personnel for the City of St. Louis, responsible for establishing eligibility lists for employment and promotion by the Fire Department.
3. Intervenor Michael Davis is a non-black employee of the City of St. Louis who has applied for employment with the St. Louis Fire Department. He has a position on both the promotional hiring *951 list and the open competitive hiring list. Intervenors Edwin David Banta and George Hohman are members of a class of 177 non-black firefighters, all of whom have undergone testing for evaluation and promotion to the rank of Fire Captain and all of whom are on the current eligibility list for such promotion. Intervenors Donald Blackwell, Nick Altmeyer and George Tschlis are members of a class of 100 non-black Fire Captains, all of whom have undergone testing and evaluation for promotion to the rank of Battalion Chief and all of whom are on the current eligibility list for such promotion.
4. The Fire Department of the City of St. Louis is a division of the Department of Public Safety of the City of St. Louis. The Director of the Department of Public Safety, Mr. Joseph B. Clark, is an appointee of the Mayor. The Fire Chief is responsible to the Director of the Department of Public Safety. The Fire Chief is responsible for the day-to-day operation and policies of the department. Under the Fire Chief are the Deputy Fire Chiefs, responsible for the management of the department in its day-to-day functions. The Deputy Fire Chiefs each supervise one-third of the Fire Department's personnel, as each is assigned to one of the three shifts. The Deputy Fire Chiefs respond to any and all major alarms of fire. The City of St. Louis is divided, for the purposes of the Fire Department, into seven districts. In charge of each district is the Battalion Chief, who reports to the Deputy Fire Chief. The Battalion Chief has supervision over approximately eight companies, the number varying depending upon the size and fire hazards within each district. The Battalion Chief is responsible for the companies, including the men, officers, equipment, houses, and the fire safety of the individuals and property located within the district. The Fire Captain serves below the Battalion Chief. The Fire Captains work in shifts and are responsible for the men and equipment under their supervision. The Fire Captain is also responsible for the training of individuals under his supervision.
5. The rank structure of uniformed personnel in the St. Louis Fire Department, in ascending order of rank, is Firefighter, Fire Captain, Battalion Chief, Deputy Chief, and Fire Chief.
6. As of November 30, 1974, there were approximately 1,000 uniformed personnel employed in the St. Louis Fire Department, of whom approximately 110 (11%) were black.
7. Applicants for the entry level position of fire fighter are required to be residents of the City of St. Louis on their date of application.
8. On November 30, 1974, there were approximately 180 persons in the rank of Fire Captain, of whom 4 (2.2%) were black. No black has ever held a uniformed position in the Fire Department above the rank of Fire Captain.
9. In the period since November 30, 1964, 95 whites and 1 black have been promoted to the position of Fire Captain. The black was Daniel Austin, promoted to Fire Captain on May 22, 1966.
10. Pursuant to the provisions of the City Charter, appointments to the entry level position of Firefighter, and promotions to higher positions within the Fire Department, are made from eligibility lists prepared by the Personnel Department of the City of St. Louis. The Personnel Department, in response to a requisition for personnel made by the Fire Department and approved by the Director of Public Safety and the Budget Department, certifies to the Fire Department, in order of rank from the appropriate eligibility list, a number of persons equal to the number of vacancies to be filled, plus two. The Fire Department then appoints from those certified the persons it wishes to fill the vacancies.
11. In certifying persons for the entry level position of Firefighter, the Personnel Department first certifies, in order of rank, persons from an eligibility list of qualified applicants who are then permanent city employees (the promotional *952 list). After that list is exhausted, certification is made in order of rank from a list of all other qualified applicants (the open competitive list).
12. An eligibility list expires two years from the date it is established, or when it is pre-empted, whichever is sooner. In the period since November 1, 1964, eligibility lists for the entry level position of Firefighter were established on October 15, 1974; September 28, 1971; March 6, 1969; October 31, 1966; and November 6, 1964. Since January 1, 1962, eligibility lists for the position of Fire Captain have been established in 1962, 1964, 1967, 1969, 1971 and 1974. Eligibility tests for the rank of Battalion Chief were established in 1967, 1969, 1971 and 1974.

Entry Level Positions
13. All persons appointed to the entry level position of Firefighter are required to complete successfully a probationary period of up to one year, including an initial training course in firefighting. Of the 307 persons appointed to the entry position of Firefighter since November 30, 1964, 3 have been terminated for inability to perform satisfactorily the duties of a Firefighter.
14. In 1969 ranking on the open competitive eligibility list was based on the applicant's scores on a written test, a physical strength and agility test and an evaluation of the applicant's experience and education. Minimum passing scores were established for the written and physical tests. Those attaining passing scores on the written and physical tests were ranked on the eligibility list, with the results weighted as follows: 50% on the written test; 35% on the physical test; and 15% on the education and experience evaluation.
15. In 1971 and 1974, ranking on the open competitive eligibility list was based on the applicant's score on a written test and on a physical strength and agility test, with a minimum passing score established for each test. The results of each test were weighed 50% in the ranking.
16. The mean scores for blacks and whites on the written examination for the entry level position utilized in 1974 were approximately 56.70 and 71.95 respectively. The approximate mean scores attained by blacks and whites on the physical agility test administered in 1974 were 51.24 and 49.13 respectively.
17. Seven hundred thirty-four persons took the written test for the entry level position in 1974, of whom 267 (36.4%) were black. The cut-off score utilized in 1974 for placement on the eligibility list eliminated approximately 51% of the black applicants and 25% of the white applicants who took the two examinations.
18. The current promotional and open competitive eligibility lists contain 26 and 360 names, respectively. Eight (30.8%) of the 26 persons on the promotional list are black. Eighty-one (24.3%) of the 334 persons on the open competitive list (not counting those persons also on the promotional list) are black, including 10 (10%) of the first 100 persons.
19. On June 16, 1975, the parties agreed, with the consent of the Court, to allow the City of St. Louis, its officers and agents, to proceed with the hiring of individuals for the entry level position in accordance with the terms of a "Partial Consent Decree" which is incorporated herein. See Appendix A.

Fire Captain Position
20. For the examinations for the position of Fire Captain, for the eligibility lists established in 1962 through 1965, and in 1974, applicants were required to have served at least five years in the position of Firefighter or above. For the examinations for the position for the lists established in 1967 through 1971, applicants were required to have served seven years in the position of Firefighter or above. The increase in the required number of years of service from five to seven years was made on the recommendation of an outside consultant hired by the Fire Department. The decrease for the 1974 eligibility list from seven to five years required service was also *953 made on the advice of an outside consultant.
21. From 1962 through 1971, ranking on the eligibility list for Fire Captain was determined by a written test, an experience and training score, and a service rating. These scores were weighed as follows: 45% on the written test; 40% on the experience and training score; and 15% on the service rating.
22. Ranking on the eligibility list for Fire Captain for 1974 was determined as follows: written test score weighed 45%; experience and training score weighed 45% and service rating weighed 10%.
23. Applicants for the position of Fire Captain were required to meet minimum requirements for experience and service ratings, and achieve a minimum passing score on the written examination in order to be ranked on the eligibility list.
24. The experience and training score of the applicants in 1970 and 1974 was determined by the positions held in the Fire Department in the ten years preceding the application. Points in the final ranking were awarded for each month of experience. In 1974, all applicants with ten or more years experience received 45 points. Applicants with the lowest experience and training score received 31.5 points. One hundred fifty-four (81%) of the 189 persons on the 1974 eligibility list for Fire Captain received the maximum 45 points for experience and training.
25. The service rating score for applicants in 1971 and 1974 was based on the last supervisory rating received by the applicant prior to the cut-off date on the examination announcement. Applicants who made the minimum scores on the other parts of the examination for the position of Fire Captain received from seven to ten points for service ratings in the final ranking on the eligibility list. One hundred seventy-six persons (93%) of the total 189 persons ranked on the 1974 eligibility list received between 7.8 and 9.2 points for service ratings.
26. The mean scores for black and white applicants on the written test for Fire Captain in 1974 were 69.72 and 76.59 respectively. Forty-seven blacks and 406 whites took the 1974 written examination. Twelve blacks and 177 whites achieved a passing score on the examination. Twelve of the 189 persons (6.3%) on the current eligibility list for Fire Captain are black, with the highest ranked black on the list ranked at number 55.
27. Only approximately 18 persons will be promoted from the 1974 eligibility list.

Battalion Chief
28. For the examinations for Battalion Chief for the eligibility lists established in 1962 through 1965, and in 1974, applicants were required to have served at least five years in the position of Fire Captain or above. For the examination for Battalion Chief for the eligibility list established in 1967 through 1971, applicants were required to have served at least eight years in the position of Fire Captain or above.
29. As stated above, there are currently only 4 black Fire Captains. Of the 3 black Fire Captains who took the 1974 Battalion Chief Exam, 2 passed. One of those two has a sufficiently high ranking that appointment is possible. An adverse impact on blacks has not been established.

Deputy Chief and Fire Chief
30. There is simply no evidence from which to conclude that the examinations for these positions have an adverse impact on blacks.
31. Plaintiffs oppose the time-in-grade requirement for these positions. Although time-in-grade requirements have been increased in the past, they have been lowered to the original requirement in the recent past. Any adverse impact suffered from the increase is no longer in existence.

Selection Procedure
32. It is clear that the differences found in performance by blacks and *954 whites on the Firefighter written examination and the Fire Captain examination are statistically significant.
33. Prior to the effective date of Title VII, as amended to include state and local governments (March 24, 1972), the City of St. Louis made no attempt to validate any of the written tests or other standards or requirements utilized in the selection of persons for entry level or promotional positions in the St. Louis Fire Department.
34. In the spring of 1973, the City of St. Louis hired an outside consultant, Dr. Lawrence O'Leary, to develop a proper selection device.
35. Dr. O'Leary's report indicates that the content validation approach was used in devising the selection procedure because (a) the possibility of collusion by applicants existed, making the use of an identical test from year to year undesirable; and (b) because the number of promotions per eligibility list is small, it would be difficult to rely on evidence of a predictive nature derived from small samples. In addition, the lack of valid criteria for work performance precluded the use of a criterion related validity study.
36. Dr. O'Leary proceeded to conduct a job analysis for the position of Fire Captain and Battalion Chief. The methods used for the analysis of the two jobs were essentially the same. Captains, and Battalion Chiefs, were selected at random from each of the districts. Lengthy interviews of up to two hours were conducted. Twenty-seven Fire Captains were interviewed as was one Battalion Chief from each district.
37. The interviews asked for a complete specification of all components of the job, critical incidents, and qualities considered to be necessary or desirable for satisfactory performance of the job. The information obtained was then summarized by tabulating the number of times each different component was mentioned; its ranking in importance by each person interviewed; and the percentage of time spent on each component.
38. Dr. O'Leary made a decision to increase the length of the Fire Captain's examination, from 100 to 125 questions, to achieve higher reliability. He also decided not to measure skills, abilities and personal characteristics, but only the knowledge required for the job. This decision was made because of the undesirability of measuring such items in a paper-and-pencil test.
39. Questions on the examinations were distributed among the knowledge areas required, in accordance with the areas' importance. Questions from which the test was constructed were obtained from the test exchange service of the International Governmental Personnel Management Association from questions constructed specifically for the tests by researchers. Questions were checked for their applicability to the City of St. Louis. The best questions were selected. These questions were then shown to the Fire Chief and a Deputy Fire Chief for their approval. The questions were selected after passing the following criteria:
a) approved by at least two members of the three-man validation task force as job related;
b) acknowledged to be job related by an expert panel of technical advisors from the Fire Department;
c) judged to have the least number of words necessary to successfully convey the meaning of the question.
The last criteria resulted from a determination that in prior examinations, minority candidates had difficulty with the longer questions.
40. Dr. O'Leary suggested that supervisory skills, which could not feasibly be included in a written examination, be tested during the working test period.
41. Dr. O'Leary recommended a range within which to establish a cut-off score. The cut-off score chosen, 78, was within the range.
42. Of the 189 persons on the eligibility lists, only a small fraction will actually be appointed during the life of the list.
*955 43. Another possible method of testing for promotions is the Assessment Center approach. Because of the large number of candidates, however, the costs of utilizing such an approach would be prohibitive. The estimated cost was $500.00 per candidate.
44. Dr. Richard Barrett, plaintiffs' expert, raised various criticisms of the examination. Dr. Barrett, however, had never performed a content validity study for a fire department, had not made any study of the knowledge and skill required for the jobs of Fire Captain and Battalion Chief, and had not even studied any manuals relating to the skills and knowledge needed. Dr. Barrett approved of the use of the working test period and service ratings. He conceded that budgetary considerations would have to be given weight in devising a selection procedure. Although critical of 10 of the 125 questions, Dr. Barrett stated that not every question on the examination needed to be content valid for the test itself to be valid. He further conceded that there had never been a perfect examination.
45. While the Court is aware of Dr. Barrett's credentials in the field, the Court concludes that his opinions herein are not entitled to credence. He was not at all familiar with the jobs involved. His criticisms of the examination amounted to no more than nit-picking. Dr. Barrett was critical of only a small portion of the examination and yet was of the belief that not every question needed be valid in order for the test itself to have validity. His conclusion, that the examination lacked validity, was not supported even by his own testimony. In sum, Dr. Barrett was not an impressive witness herein.

Supper Clubs
46. The evidence establishes that Fire Department personnel have established supper clubs on a very informal basis for the benefit of club members, at the various firehouses. There is no evidence tying or connecting any one club with any other. The members contribute money for the expenses of utensils and food. One member is the cook, who has the discretion and authority to determine who is a member of the club.
47. The cooking facilities themselves belong to the Fire Department. The utensils, however, are the property of the supper clubs.
48. There is evidence that blacks have been excluded from many of these clubs. There is no evidence, however, to indicate that the exclusions were anything more than the individual decisions of some white firemen not to dine with black firemen; these decisions were not the result of any Fire Department directive or order. These exclusions frequently result in blacks, where a minority in a firehouse, cooking and eating apart from their white associates.[1]
49. The problem created by the supper club obviously exacerbates racial tensions and as such, runs counter to the policies of the laws of this country. Yet should a federal court issue some type of mandatory order to each firehouse setting out regulations relating to buying food, preparing it, serving it and eating it? The answer seems obvious. The Director of Public Welfare, Joseph Clark, testified that the problems with the supper clubs were coming under control. Mr. Clark, who himself is black, pledged all his efforts to eradicate this reprehensible practice from the St. Louis Fire Department. This Court believes that, at this time, it is inadvisable to involve itself in these supper clubs. In the event that this problem persists and remains without improvement six months from this date, the Court will reconsider this issue and seek specific proposals from city officials and the parties.

Overt Discrimination
50. George Horne applied for, and was examined for, promotion to the position of Fire Captain in 1969. After *956 the examination, he was ranked twenty-first on the 1969 eligibility list.
51. In the spring of 1971, the Director of Public Safety met with officials of the local firefighters union, and agreed to end the delay in filling Fire Captain vacancies.
52. Thomas Vetter, a vice-president of the union, surveyed the Fire Department for vacancies. He found that six vacancies existed and so notified Horne of this fact by a letter postmarked August 13, 1971. At that time, Horne was sixth on the list.
53. Alfred Newman, a Deputy Chief of the Fire Department told Horne that he would speak with the Fire Chief concerning an appointment to Fire Captain.
54. On August 31, 1971, the Department issued a requisition for only four Fire Captains. Therefore, Horne was not appointed. Shortly thereafter, the 1969 eligibility list expired.
55. On December 13, 1971, the Fire Department issued a requisition for four Captains to be appointed from the 1971 eligibility list. That requisition form indicates that two of the positions as Fire Captain had been vacated by death and resignation on September 21, 1971 and July 17, 1971 respectively.
56. The Court is unable to find that Horne was denied promotion because of his race. The requisition form is signed by Denis Broderick, who was the Fire Chief and appointing authority. There is no indication in the record that either Thomas Vetter, a union official or Alfred Newman, a Deputy Fire Chief, had the authority to determine the necessary number of Fire Captains, and requisition the same. Nor does there appear to be a requirement that all vacancies in a position be filled as soon as they appear. Budgetary considerations could well have forced the Fire Chief, assuming that there were in fact six vacancies, to request only four appointments. There is no evidence from which to conclude that the Fire Chief confirmed the fact of six vacancies. Under these circumstances, the Court can not find that Horne was denied promotion because of his race.
57. There is absolutely no evidence from which to conclude that Preston Sims was denied employment because of his race.

CONCLUSIONS OF LAW
This Court has jurisdiction over the subject matter and of the parties to this action. Defendants' and intervenors' objections to the presence of the United States as plaintiff herein are without merit. See 42 U.S.C. § 2000e-5(f)(1).
As has been frequently stated, Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq.,
. . . proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.
. . . . .
Nothing in the Act precludes the use of testing or measuring procedures; obviously they are useful. What Congress has forbidden is giving these devices and mechanisms controlling force unless they are demonstrably a reasonable measure of job performance. Griggs v. Duke Power Co., 401 U.S. 424, 431, 436, 91 S.Ct. 849, 853, 856, 28 L.Ed.2d 158, 164, 167 (1971) (emphasis added).
The statistical evidence presented establishes that the tests involved had a disparate impact on blacks. Accordingly, the defendant City must establish that the tests are a "reasonable measure of job performance". See also, Boston Chapter, NAACP, Inc. v. Beecher, 504 F.2d 1017 (1st Cir. 1974), cert. denied, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975) (means of selection must be substantially related to job performance); Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972) (there must be a fit between *957 the qualifications and the job); Douglas v. Hampton, 168 U.S.App.D.C. 62, 512 F.2d 976 (1975) (the test must bear a demonstrable relationship to successful job performance); United States v. Georgia Power Company, 474 F.2d 906 (5th Cir. 1973) (manifest relationship between the test and the job is required).
There are various means of establishing the relationship between the examination and job performance.
The preferred method of test validation is criterion-related or empirical validity, which includes what are referred to as the predictive and concurrent methods of validation. Predictive validation consists of a comparison between the examination scores and the subsequent job performance of those applicants who are hired. If there is a sufficient correlation between test scores and job performance, the examination is considered to be a valid or job-related one. Concurrent validation requires the administration of the examination to a group of current employees and a comparison between their relative scores and relative performance on the job.
. . . . .
An examination has content validity if the content of the examination matches the content of the job. For a test to be content valid, the aptitudes and skills required for successful examination performance must be those aptitudes and skills required for successful job performance. It is essential that the examination test these attributes both in proportion to their relative importance on the job and at the level of difficulty demanded by the job. Vulcan Society of New York City Fire Department, Inc. v. Civil Service Commission of the City of New York, 360 F.Supp. 1265, 1273-74 (D.C.N.Y. 1973), modified, 490 F.2d 387 (2nd Cir. 1973).
See also, Boston Chapter, NAACP, Inc. v. Beecher, 371 F.Supp. 507 (D.C.Mass. 1974), aff'd, 504 F.2d 1017 (1st Cir. 1974), cert. denied, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); Douglas v. Hampton, supra; Bridgeport Guardians, Inc. v. Members of the Bridgeport Civil Service Commission, 482 F.2d 1333 (2nd Cir. 1973), cert. denied, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975).
The Guidelines of the Equal Employment Opportunity Commission authorize the use of a content validation approach "where criterion-related validity is not feasible". 29 C.F.R. § 1607.5. Dr. O'Leary stated that criterion-related validity was not possible in the present context. Such validation was not feasible because of the lack of valid criteria for work performance, the small number of persons promoted from each eligibility list and the possibility of collusion. Predictive validation, consisting of a comparison between test scores and job performance, raises an additional problem, not mentioned by Dr. O'Leary. Defendants herein were required by law to establish a valid selection procedure. Such a duty was an immediate one. Predictive validation of necessity requires a great deal of time since presumably the applicants must be given a sufficient orientation period in the jobs before their performance is analyzed against their examination scores. See Commonwealth of Pennsylvania v. Glickman, 370 F.Supp. 724, 732 (D.C.Pa.1974). But defendants had the duty to establish a valid selection procedure immediately. If the predictive validation approach were used, a test would have to be constructed, persons chosen for positions on the basis of the results of that test, and at a later date, analyses of their performance made. If the test were found not to be valid, the process would have to begin again. This Court is unable to find authority for granting an employer an exemption from the requirements of the law while a validation study is underway. It is the Court's conclusion that predictive validation would not be feasible and the Court is of the opinion that a content validity approach was the only feasible approach in the present context.
While the Equal Employment Opportunity Commission Guidelines are entitled *958 to great deference, Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), it is worth noting that the Guideline requirement that the content validity approach be used only when the other methods are not feasible has been disputed by the Courts. In Vulcan Society of New York City Fire Department, Inc. v. Civil Service Commission of the City of New York, 360 F.Supp. 1265, 1273-74 (D.C. N.Y.1973), modified, 490 F.2d 387 (2nd Cir. 1973), the experts involved were of the opinion that concurrent validation was less desirable than predictive validation "because of the possibility that some distortion may result from either the experience or lack of motivation of the current employees who participate in the examination for experimental purposes". Id. at 1273. See Vulcan Society of the New York City Fire Department, Inc. v. Civil Service Commission of the City of New York, 490 F.2d 387, (2nd Cir. 1973) (today's preferred method may be rejected tomorrow); Kirkland v. New York State Department of Correctional Services, 374 F.Supp. 1361, 1371 (D.C.N. Y.1974), modified, 520 F.2d 420 (2nd Cir. 1975) (a content-valid examination will not be set aside simply because the other methods of validation were not used). The required burden that the employer must meet is not one of compelling interest or lack of feasible alternative, Chance v. Board of Examiners, 458 F.2d 1167 (2nd Cir. 1972); Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972), but simply that there is a substantial relationship between the scores and job performance.
Having found that Dr. O'Leary was justified in choosing the content validation approach, the Court must now determine if the examination is valid. In order to be valid, the content of the examination must match the content of the job. In Vulcan Society, supra, 490 F.2d at 396, the court stated
If an examination has been badly prepared, the chance that it will turn out to be job-related is small. Per contra, careful preparation gives ground for an inference, rebuttable to be sure, that success has been achieved. A principle of this sort is useful in lessening the burden of judicial examination-reading and the risk that a court will fall into error in umpiring a battle of experts who speak a language it does not fully understand.
See also Kirkland v. New York State Department of Correctional Services, 520 F.2d 420 (2nd Cir. 1975). This Court is not holding that plaintiffs must rebut an inference created by Dr. O'Leary's qualifications. Nonetheless, it is important to note that the examinations involved were the result of careful and extensive research. In many of the cases cited to this Court, such was not the case. See e. g., Boston Chapter, NAACP, Inc. v. Beecher, supra, (the test was not professionally developed nor had there been any analysis of the required job skills); Fowler v. Schwarzwalder, 351 F.Supp. 721 (D.C.Minn.1972), rev'd on other grounds, 498 F.2d 143 (8th Cir. 1974) (no attempt made to relate the relative importance of job duties or to correlate the same to the number of test questions; no systematic or empirical review of the elements of the job); Kirkland v. New York State Department of Correctional Services, 374 F.Supp. 1361, modified, 520 F.2d 420 (2nd Cir. 1975) (inadequate job analysis); Western Addition Community Organization v. Alioto, 340 F.Supp. 1351 (D.C.Cal.1972), appeal dismissed as moot, 514 F.2d 542 (9th Cir. 1975) (no job analysis performed).
To prove that an examination has content validity,
. . . defendants must demonstrate not only that the knowledge, skills and abilities tested for by [the examination] . . . coincide with some of the knowledge, skills and abilities required successfully to perform on the job, but also that 1) the attributes selected for examination are critical and not merely peripherally related to successful job performance; 2) the various portions of the examination are accurately weighted to reflect the relative importance to the job of the attributes for which they test; and *959 3) the level of difficulty of the exam matches the level of difficulty for the job. Kirkland v. New York State Department of Correctional Services, 374 F.Supp. 1361, 1372, modified, 520 F.2d 420 (2nd Cir. 1975).
It is clear from the facts that Dr. O'Leary's analysis and examination comported with these requirements. The job analysis was thorough and complete. The questions were distributed among the areas of knowledge required in accordance with the importance given to the area by the persons interviewed. The Court is aware of case law indicating that "all or substantially all the critical attributes" of the job must be included in the examination. Kirkland, supra at 1372. Plaintiffs herein contend that the examination is invalid because certain skills, such as supervisory skills, were not included in the written examination. Nonetheless, the Court concludes that the examination was valid. Even plaintiffs' own expert approved the use of the working test period, during which time supervisory skills could be more adequately evaluated. He also approved of the use of service ratings. The Equal Employment Opportunity Commission Guidelines themselves impliedly recognize the use of written and evaluative examinations. See 29 C.F.R. § 1607.13. Furthermore, there is support in the law for the use of non-comprehensive written examinations. See Bridgeport Guardians, Inc., supra. The job analysis conducted herein convinces this Court that the areas tested sufficiently identify suitable candidates for promotion. It was clear from the interviews conducted that knowledge of fire fighting and inspection were considered to be very important.
The Court further concludes that the cut-off score was validly established. The Equal Employment Opportunity Commission Guidelines require that the "cut-off score will be reasonable and consistent with normal expectations of proficiency within the work force or group . . .". 29 C.F.R. § 1607.6. It was clear from the evidence that only a few persons from the eligibility list would be promoted. Under such circumstances, the Court can not conclude that the cut-off score was unreasonable, or inconsistent with the required criteria.
Even plaintiffs' expert conceded that a perfect examination is not possible. A perfect test is a goal "as illusory as perfect schools or perfect courts . . .". Boston Chapter, NAACP, Inc., supra, 504 F.2d at 1022. The Court concludes that the examination had content validity. This is all that the law requires of an employer. Neither a perfect examination, nor an examination without a disparate impact is a necessity, where, as here, the employer has established that the examination has been validated in accordance with recognized methods. The examination for Fire Captain meets the criteria established by law. The Court has found that there was no evidence of a disparate impact in connection with the examinations for Battalion Chief, Deputy Chief and Fire Chief. Accordingly, the burden of establishing that those examinations were valid does not shift to the employer. See Griggs v. Duke Power Co., supra, 401 U.S. at 431, 91 S.Ct. at 853, 28 L.Ed.2d at 164.
The Court has found that the exclusions of blacks from the supper clubs was not the result of any actions by defendants, but instead the result of private decisions by individual fire personnel. Under such circumstances, defendants have not violated any statutory duties. Because of the tensions created by the situation, however, the Court will request that defendants do all that they can to eradicate the problem, and will allow plaintiffs to return to Court should the situation persist.
The parties are in dispute as to the meaning of a certain aspect of the partial consent decree. That decree requires the St. Louis Fire Department to establish a racial composition that approximates the racial composition of the City of St. Louis as a whole. The issue disputed is whether the reference group should be the total uniformed personnel of the Fire Department (approximately *960 1,000 persons) or the total number of Firefighters (approximately 750 persons). It is the Court's conclusion that the latter figure shall control. The terms of the partial consent decree provide that it shall remain in effect until, after a period of five years from date of entry, defendants move that it be dissolved.
The Court has found that the examination for Fire Captain was properly validated as required by law. Plaintiffs failed to prove a disparate impact as the other promotional examinations. The evidence failed to establish that either George Horne or Preston Sims were denied promotion or employment because of their race. Similarly, the evidence failed to establish that the exclusion of blacks from the supper clubs were the result of any actions by defendants. Accordingly, judgment will be entered for defendants.

APPENDIX A

PARTIAL CONSENT DECREE
The United States filed its complaint herein on March 18, 1974, alleging that the defendants were engaged in a pattern and practice of discrimination based on race in hiring for and promotion within the City of St. Louis Fire Department (known formally as the Division of Fire and Fire Prevention of the Department of Public Safety) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as amended by the Equal Employment Opportunity Act of 1972, Public Law 92-261 (March 24, 1972) and the Fourteenth amendment to the Constitution of the United States, 42 U.S.C. § 1981, and 42 U.S.C. § 1983.
Plaintiffs Firefighters Institute for Racial Equality, et al., consisting of FIRE and 10 named individuals filed suit on January 11, 1974, alleging inter alia, discriminatory practices on part of defendants in their hiring and promotion practices within the fire department of the City of St. Louis. Because of the identity of issues involved, the two cases were consolidated by the Court on March 17, 1975 with the assent of the parties.
It now appears to the Court that the parties have waived a hearing and findings of fact and conclusions of law on those issues raised by the complaint relating to the initial employment of blacks to the position of firefighter, and have agreed to the entry of this partial Consent Decree, which shall in no manner constitute findings on the merits of the case nor be construed as an admission by defendants of any violation of Title VII or of rights guaranteed by the Fourteenth Amendment, 42 U.S.C. § 1981 and 42 U.S.C. § 1983. All issues raised by the complaint with respect to the promotion of blacks and their terms and conditions of employment within the Fire Department are reserved for hearing and adjudication by this Court. Therefore, it is hereby ORDERED, ADJUDGED, and DECREED:
1. Inasmuch as it is a matter of policy and of law for the City of St. Louis not to engage in any act or practice which has the purpose or effect of discriminating against any employee of or any applicant or potential applicant for employment with the City of St. Louis Fire Department because of such individual's race or color, it hereby consents to the entry of an order permanently enjoining such conduct, and defendants are so ordered and enjoined. This does not constitute an adjudication or finding of discrimination against the defendant City. Also, the City maintains its denial of any act or practice of discrimination.
2. The defendants shall, as a long range goal, seek to recruit and hire blacks in sufficient numbers so as to achieve a racial composition in the ranks of Firefighters within the City of St. Louis Fire Department that is more representative of the racial and ethnic composition of the City of St. Louis as a whole. The goal shall be to achieve a racial composition of Firefighters in the St. Louis Fire Department which is comparable to the civilian labor force for the City of St. Louis subject to the availability of qualified applicants. In order to fulfill this goal and subject to the availability of sufficient qualified black applicants, *961 defendants shall adopt and seek to achieve a goal of hiring blacks for at least fifty percent (50%) of the vacancies for the entry level of Firefighter personnel in the Fire Department for each year during the life of this decree. For purposes of compliance with this goal, only those blacks completing their probationary period shall be counted. In no case shall defendant be required to displace incumbent employees or to hire unneeded employees or unqualified employees in order to meet the goal.
3. The defendant City, through its officials and agents, shall take all reasonable steps consistent with its obligation to meet the goals set forth in paragraph 2 above, including contact with community organizations in the black communities, such as the Urban League and NAACP, and high schools with substantial minority enrollments, for the purpose of soliciting their help in informing minorities of employment opportunities in the fire department. The City shall also use its own resources, such as the facilities of the Personnel Department to recruit qualified minorities. Such effort on the City's part shall include announcements to radio, television, and other media directed at the black communities. The City shall also cooperate with and assist available independent programs which are aimed at recruiting minorities for the City Fire Department. The defendant City shall also utilize the services of incumbent black Firefighters in its recruiting efforts to the extent that such incumbents are willing and able to assist.
4. Defendants may make appointments from the current eligibility list for Probationary Firefighter so long as they meet the interim goals set out in paragraph 2, but in no event beyond the expiration of 2 years from the date of establishment of the list. Those blacks on the current list who are not appointed during this interim period and those blacks who applied and completed the written and physical agility tests in the 1971 and 1974 examinations but were not placed on the eligibility list shall be informed by defendants that they are eligible for the next examination for the position of Probationary Firefighter without regard to the maximum age limitation.
5. In fulfilling the hiring goal set forth in paragraph 2 above, the defendants may use such written screening devices or alternative systems of testing together with age and physical fitness criteria now used for measuring qualifications to become a Firefighter; provided, however, that the use of any written screening device shall not be a defense for failure to meet the interim hiring goals set forth in paragraph 2 above. Residence in the City of St. Louis shall continue to be a requirement for the selection of Firefighters.
6. If the defendants wish to use written examinations for qualifying or ranking applicants for the position of Firefighter in a manner inconsistent with the goal provided in paragraph 2, any such written examination must have been found to be job-related and validated by a criterion related study in accordance with Title VII of the Civil Rights Act of 1964, as amended, and the Guidelines enunciated thereunder, including the Guidelines contained in 29 C.F.R. 1607.1, et seq., or otherwise have been shown to have no discriminatory impact. If defendants wish to utilize any such written examination, they shall furnish to plaintiffs, subject to appropriate protective orders, at least sixty days prior to any intended use, evidence of the absence of adverse impact and/or a copy of the validation study, and any other relevant information concerning the test and its validity. If the parties agree that the test has no adverse impact or has been validated in accordance with Title VII of the Civil Rights Act of 1964, as amended, and the Guidelines thereunder, defendants may thereafter utilize the test. If the parties disagree, the examination shall not be utilized unless and until the Court determines upon motion and such evidentiary hearing as it deems appropriate that the test has no adverse impact, or that it has been validated in *962 accordance with Title VII as amended, and the Guidelines thereunder.
7. Defendants shall retain for a period of five years all records relating to the recruitment, selection and appointment of persons for the position of firefighter, including applications submitted by all applicants, identified by race, all medical and background investigation files, evaluations of applicants, eligibility lists and requisition forms with persons identified by race. Defendants shall also retain for a period of five years all records relating to performance in the firefighter training program and during the probationary period, including a statement in detail of the reasons for termination of any individual during training or during his probationary period. The plaintiffs' attorneys shall have the right to inspect and copy any or all such documents subject to appropriate protective orders upon reasonable notice to defendants without further order of the Court. In addition, defendants shall furnish the plaintiffs with such information or records as they may request in writing, provided that such requests shall not be unduly burdensome and that plaintiff pay all reasonable costs incurred in furnishing such information and records.
8. For purposes of this Decree, a reporting period shall run from July 1 through December 31 and from January 1 through June 30 for each year. The first reporting period shall begin on July 1, 1975. Within thirty days after the close of each reporting period, defendants shall submit to the plaintiffs a written report (covering the preceding reporting period) containing the following information:
(a) The name, address, telephone number, date of appointment and race of each person appointed to the position of firefighter.
(b) The number of persons, identified by race, disqualified for appointment to the position of firefighter, classified by reason for disqualification.
(c) The name, address, telephone number, date of termination, and race of each person who was terminated or who resigned from the fire department prior to the completion of probation.
(d) The total number by race and rank of uniformed personnel on the Fire Department as of the close of the reporting period.
(e) A racially-identified copy of any eligibility list for firefighter established during that reporting period.
9. In case of conflict between the terms of this Decree and the Statutes of the State of Missouri, any rules or regulations of the Civil Service Commission, or any charter or ordinances of the City of St. Louis respecting the employment of employees of the fire department, the terms of this Decree shall prevail.
10. The Court retains jurisdiction of this action with respect to the issues raised by the plaintiffs with respect to promotion and terms and conditions of employment within the Fire Department and for such further relief or other orders as may be necessary or appropriate to enforce and insure rights to equal employment opportunity. At any time after five (5) years from the date of entry of this partial decree, defendants may move this Court on forty-five (45) days notice to plaintiffs for dissolution of this partial decree; and upon their showing that the goals of this decree in providing equal employment opportunities have been fully achieved, the decree may be dissolved.
NOTES
[1] This type of separation is both offensive and incomprehensible in groups whose very survival depends upon togetherness.