327 F.Supp.2d 1002 (2003)
Michael MARTINEZ, Plaintiff,
v.
CITY OF ST. LOUIS, et al., Defendants.
Eric Deeken, Plaintiff,
v.
City of St. Louis, et al. Defendants.
Nos. 4:01CV580, 4:01CV1770.
United States District Court, E.D. Missouri, Eastern Division.
November 5, 2003.
*1003 *1004 Clyde E. Craig, Clyde E. Craig, P.C., Chesterfield, MO, for Plaintiff.
Charles W. Bobinette, Uthoff and Graeber, St. Louis, MO, John M. Gadzichowski, U.S. Department of Justice, Washington, DC, Consolidated Filer Plaintiff.
Benjamin Blustein, Carolyn Clark, U.S. Department of Justice, Washington, DC, Wesley D. Wedemeyer, Office of U.S. Attorney, St. Louis, MO, for Consolidated Filer Plaintiff and Defendants.
Nancy R. Kistler, City Counselor, St. Louis, MO, for Defendants.
Jerome A. Diekemper, Richard P. Perkins, Diekemper and Hammond, St. Louis, MO, for Intervenors and Movants.

MEMORANDUM AND ORDER
NENGLE, District Judge.
In 1974, two separate causes of action[1] arose out of a civil rights employment dispute involving the St. Louis Fire Department ("Fire Department"). In those *1005 actions, which were subsequently consolidated for adjudication, plaintiffs Firefighters Institute for Racial Equality and ten black individuals and plaintiff United States alleged that under-representation of blacks in the uniformed ranks of the Fire Department reflected a pattern or practice of unlawful discrimination by the City of St. Louis ("City") against blacks on the basis of race in hiring, promoting, and operating practices within the Fire Department in violation of Title VII of the Civil Rights Act of 1964. Seeking to resolve the disputes in part by proposing to remedy the imbalance of black representation in the Fire Department, the parties jointly submitted a partial consent decree.
In 1976, this Court found that statistical evidence established that the entry-level examination used as part of the process for hiring firefighters had a disparate impact upon black applicants and that the exam had not been shown to be related to job performance. United States v. City of St. Louis, 418 F.Supp. 383, 384 (E.D.Mo. June 28, 1976) (amending 410 F.Supp. 948 (E.D.Mo. April 9, 1976)), aff'd in part, rev'd in part on other grounds in Firefighters Inst. for Racial Equality v. City of St. Louis, 549 F.2d 506 (8th Cir.1977). The Court adopted the consent decree's terms which provided a remedy to correct the conspicuous racial imbalance effected by the City's hiring practices. See City of St. Louis, 418 F.Supp. at 384-86 (amending City of St. Louis, 410 F.Supp. 948). Since its adoption in 1976, the consent decree has continuously governed in part the process for hiring entry-level firefighters in the Fire Department.
In 2001, Michael Martinez and Eric Deeken, two white individuals who unsuccessfully sought entry-level appointments to the Fire Department, filed separate complaints each of which alleges unlawful reverse discrimination in the City's 1998 and 2001 hiring processes. The cases were consolidated for adjudication, see Order, Case Nos. 4:01CV580-ERW & 4:01CV1770-CDP (E.D.Mo. Oct. 7, 2002) (Perry, J.), and transferred to this Court. Thereafter, on December 30, 2002, the Court issued an Order consolidating the Martinez and Deeken cases with the 1974 consolidated cases.
The following motions concerning the 1976 consent decree and the reverse discrimination claims are before the Court: Plaintiff Martinez's Motion to Dissolve Partial Consent Decree (Doc. 69), United States's Motion to Modify Consent Decree and Nunc Pro Tunc Order (Doc. 70), Intervenors' Motion to Join Motion of Plaintiff Martinez to Dissolve Partial Consent Decree (Doc. 71), Plaintiff Deeken's Motion to Dissolve Consent Decree [Retroactive to December 31, 1993] and to Declare it Unconstitutional and Void [ab initio] (Doc. 72), and Plaintiff Martinez's Motion for Partial Summary Judgment on the Issue of Substantive Liability of the City (Doc. 81).

I.
Disposition of these motions requires both reflective constitutional scrutiny of the terms of the consent decree as adopted in 1976 and fresh constitutional scrutiny of the consent decree's terms in light of changed circumstances. Accordingly, before addressing the merits of the motions, the Court makes "then and now" determinations regarding constitutionality of the consent decree.

A. Initial constitutionality
To determine whether the consent decree was constitutionally sound upon its adoption in 1976, the Court examines the provisions which purported to remedy the conspicuous black to nonblack racial imbalance in the Fire Department.
*1006 The proposed remedy was the achievement of a racial composition of entry-level non-probationary firefighters in the Fire Department that is "comparable to the civilian labor force for the City of St. Louis subject to the availability of qualified occupants." City of St. Louis, 418 F.Supp. at 384. To that end, the City was to seek to recruit and hire blacks in sufficient numbers to fill at least 50 percent of permanent fire private positions during the life of the consent decree. Id. at 384-85. Thus, under the consent decree, the City was to base hiring decisions partially on considerations of race.
Hiring decisions based on race are to be reviewed under the equal protection clause of the Fourteenth Amendment. Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 273, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). The validity of a consent decree's affirmative action plan is a question of law that requires strict judicial scrutiny. Adarand Constructors Inc. v. Pena, 515 U.S. 200, 227, 115 S.Ct. 2097, 2113, 132 L.Ed.2d 158 (1995); City of Richmond v. J.A. Croson Co., 488 U.S. 469, 493-94, 109 S.Ct. 706, 722, 102 L.Ed.2d 854 (1989); Donaghy v. City of Omaha, 933 F.2d 1448, 1458 (8th Cir.1991). To survive strict scrutiny, a remedial plan must be "narrowly tailored" to effect a "compelling governmental purpose." United States v. Paradise, 480 U.S. 149, 167, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (1987).
Remedying the effects of past discrimination is a compelling governmental purpose. E.g., id. In the 1970's, the conspicuous racial imbalance in the ranks of Fire Department uniformed personnel, entry-level employment in which was not conditioned on specialized skills and education, was an effect of past discrimination.[2]
Any plan chosen to remedy the effect of racially discriminatory hiring practices must be narrowly tailored to serve its remedial purpose, Adarand, 515 U.S. at 237, 115 S.Ct. 2097, and the choice of that remedy "is a balancing process left, within appropriate constitutional ... limits, to the sound discretion of the trial court," Paradise, 480 U.S. at 184, 107 S.Ct. 1053 (internal punctuation omitted). In this case, the consent degree's remedial terms were sufficiently narrowly tailored for the purpose of correcting the discriminatory effects of the hiring practices of the Fire Department, as shown by the following observations.
First, the remedial plan did not require the City to hire unqualified applicants or unnecessary personnel. Cf. Paradise, 480 U.S. at 177-78, 107 S.Ct. 1053 (noting with approval that plan required neither promotions of unqualified applicants nor unnecessary or gratuitous promotions). Second, the remedial plan focused only on the minority proven to have been subjected to discriminatory practices. Compare Donaghy, 933 F.2d at 1460 (observing that remedial plan "was not overinclusive" because consent decree's goals applied to blacks, "the minority group identified as underutilized"), with Croson, 488 U.S. at 506, 109 S.Ct. 706 (holding affirmative action *1007 plan not narrowly tailored where "grossly overinclusive" plan included minorities never identified as having suffered from discrimination). Third, nonblacks were not excluded from hire, nor were incumbent nonblack employees to be terminated to make room for black hirees. See Paradise, 480 U.S. at 182-83, 107 S.Ct. 1053 (noting with approval that one-for-one hiring requirement did not require layoff and discharge of white employees); United Steelworkers of Am. v. Weber, 443 U.S. 193, 208, 99 S.Ct. 2721, 2730, 61 L.Ed.2d 480 (1979) (observing with approval that plan did not "unnecessarily trammel" white employees' interests by replacing whites with new black hirees). Fourth, the consent decree was not intended to be a permanent remedy, in that it provided for its dissolution.
The consent decree's provision for dissolution was not without flaw. Provided that the parties were able to show "that the goals of this decree in providing equal employment opportunities have been fully achieved," City of St. Louis, 418 F.Supp. at 386, the consent decree provided two means for dissolution. The first was by court order granting the motion of a party to the consent decree to dissolve on the basis that racial parity had been achieved. The second was through agreement by the parties that the testing procedure was valid and job-related or, upon motion of a party, issuance of a court order determining validity and job-relatedness. The flaw in these means for dissolution is that only the parties to the consent decree were authorized to act to dissolve the decree.
Recognition of such flaw, however, does not mandate a conclusion that the consent decree was not narrowly tailored to effect its remedial purpose. The provisions of the consent decree that are under scrutiny were adopted in an order of the Court; accordingly, those provisions remained subject to court oversight of their continuing applicability should any entity present evidence of changed circumstances warranting dissolution or otherwise call for fresh constitutional scrutiny. "While the entry of an affirmative action consent decree does not guarantee that the decree serves a remedial purpose or is narrowly tailored, the heightened judicial oversight inherent in a properly entered decree helps attain that end." Donaghy, 933 F.2d at 1459; see also Local 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 525, 106 S.Ct. 3063, 3077, 92 L.Ed.2d 405 (1986) ("[A] federal court is more than `a recorder of contracts' from whom parties can purchase injunctions; .... the consent decree ... must further the objectives of the law upon which the complaint was based."); cf. also Paradise, 480 U.S. at 184, 107 S.Ct. 1053 (noting that remedial plans are not necessarily limited to least restrictive means of implementation).
Therefore, inasmuch as (1) remedying the effects of past discrimination by providing means to correct the imbalance of black-to-nonblack employees in the Fire Department was a compelling governmental interest, (2) the terms of the consent decree, with the exception of the express dissolution provisions, were narrowly tailored in attempting to correct the effects of unlawful discrimination, (3) the terms of the consent decree were, and continue to be, subject to ongoing judicial oversight, and (4) the Court will not permit the literal dissolution provisions to summarily block dissolution motions by non-parties, the Court concludes that the consent decree, as adopted and incorporated into the 1976 Nunc Pro Tunc Order of the Court, was constitutionally sound.

B. Present constitutionality
Having concluded that the consent decree, in the context of its adoption by court order in 1976, was narrowly tailored *1008 to accomplish a compelling governmental purpose, the Court similarly scrutinizes the terms of the consent decree in light of present circumstances.
In 1990, racial parity as defined by the consent decree had not been achieved. Order and Memorandum, Nos. 74-200C(1) & 30(C)(1), slip op. at 4-5 (E.D.Mo. October 1, 1990). In 1990, Blacks represented 32 percent of the ranks of entry-level non-probationary uniformed fire fighters, or "fire privates," in the Fire Department, whereas black representation in the City's civilian labor market in 1990 was 41.3 percent. Id. at 3. During the 1990s, as the City continued to hire blacks to fill 50 percent of the probationary fire private vacancies, the percentage of blacks employed as permanent fire privates steadily increased, from 38 percent as of December 1991 to 45.3 percent as of June 2002, Joint Stips. ¶¶ 36-37. Since June 2001, the comparative black representation in the fire private ranks has been within 1 percentage point of the black representation in the City's civilian labor force. Furthermore, the reports of the parties' experts[3] are in agreement that as of June 2002, the percentage of blacks among fire privates and the St. Louis civilian labor force was nearly equal. The fact of those nearly equal percentages show that the consent decree's racial-parity goal has been achieved.
Provisions designed to remedy past discrimination should not have perpetual duration beyond the point where their remedial purpose has been met. Setser v. Novack Inv. Co., 657 F.2d 962, 969 (8th Cir.1981). Where, as here, the justification for employing race-based hiring practices was the compelling government interest in correcting the effects of past discrimination, and where that justification no longer exists, then the race-based hiring practices can no longer survive strict scrutiny. Detroit Police Officers Ass'n v. Young, 989 F.2d 225, 227-28 (6th Cir.1993).

C. Conclusions
From the foregoing discussion emerge three conclusions which are dispositive in certain aspects of the motions before the Court: (1) the remedial terms of the consent decree were constitutionally sound when adopted; (2) non-parties are not precluded from moving for dissolution of the consent decree; and (3) the remedial terms of the consent decree are no longer constitutional.

II.
In the motions before the Court: the United States seeks conditional modification of the consent decree; plaintiff Martinez and two white Intervenors seek dissolution of the consent decree; plaintiff *1009 Deeken seeks dissolution of the consent decree as void ab initio, or in the alternative, dissolution made retroactive to December 31, 1993; and Martinez additionally seeks summary judgment as to the City's substantive liability to him.

A. Modification or dissolution of the consent decree

1. Modification
The United States, a party to the consent decree, now seeks its modification. The United States moves the Court to require the City to implement a selection procedure for the position of probationary fire private that complies with Title VII of the Civil Rights Act of 1964. The United States contends that only upon implementation of an approved fire fighter selection procedure should the one-for-one hiring requirement be dissolved.

2. Dissolution
Martinez, Deeken, and the Intervenors, who were not parties to the consent decree, seek its dissolution.

a. The underlying reverse discrimination claims
Martinez and Deeken are whites who were eligible for appointment as probationary fire privates as a result of the Fire Department's 1998 and 2001 hiring processes.
In each of the 1998 and 2001 hiring processes, applicants possessing certain non-race-related minimum qualifications were evaluated according to scores received in weighted components of the hiring process: written component, 40 percent; physical component, 50 percent; education and training component,[4] 10 percent. The names of all persons whose final composite scores qualified them for employment were placed on an eligibility list for probationary fire private positions. The eligibility list was comprised of a "promotional list" consisting of applicants who were permanent full-time employees of the City and an "open list" consisting of applicants who were not permanent full-time employees of the City.
To fill existing vacancies in compliance with the consent decree's race-based hiring goal, an equal number of black and nonblack applicants were to be certified as eligible in order of their ranking on the eligible list, with promotional applicants to be certified prior to non-promotional applicants. If an insufficient number of promotional applicants were available for certification in order to fill the requisition with an equal number of black and nonblack applicants, then applicants were to be certified from the open list. The certification was to include the number of vacancies noted on the requisition as well as "alternate" eligibles. The Fire Chief was to make the appointments and to return the certification form to the Department of Personnel specifying said selections. Candidates offered positions were then required to pass a medical examination.
*1010 From the eligible list generated by the 1998 selection process, the Fire Department hired five recruit classes between March 1999 and October 2001 for a total of 168 recruits. From the eligible list generated by the 2001 selection process, the City hired one class of 20 recruits (one of whom was subsequently replaced by a 21st recruit) in October 2002. The City has not hired anyone on the open list created by the 2001 testing process, which is set to expire on November 28, 2003.[5]
In 1998, Martinez was ranked No. 67 on the "promotional" list of eligible applicants, and Deeken scored the highest of all applicants on the "open" list. In March 1999, the City appointed as probationary fire privates eight (8) black candidates on the promotional list who had lower composite scores than Martinez's score. Between March 1999 and October 2001, the City appointed black probationary fire private candidates from the open list with composite scores that were lower than Deeken's score. Neither Martinez nor Deeken was hired, and no whites who scored less than Deeken were hired.
Martinez and Deeken, each asserting that racial parity was achieved prior to their having sought appointment as fire fighters in the Fire Department, seek in their underlying actions immediate placement as fire fighter, monetary damages and expenses, and dissolution of the consent decree.

b. Opposition to dissolution
F.I.R.E., a party to the 1974 consent decree, contends that the consent decree cannot be dissolved because the City has never validated the 1998 or 2001 written tests. Specifically, F.I.R.E. points to the following paragraph of the consent decree:
If the defendants wish to use written examinations for qualifying or ranking applicants for the position of Firefighter in a manner inconsistent with the [hiring goal], any such written examination must have been found to be job-related and validated by a criterion related study in accordance with Title VII of the Civil Rights Act of 1964 as amended, ... or otherwise have been shown to have no discriminatory impact.
City of St. Louis, 418 F.Supp. at 385. F.I.R.E. contends that because the written test results in the 2001 hiring process had a discriminatory impact on black test takers, and because the City has never validated the written test, the consent decree should not be dissolved even in the face of a determination that racial parity has been achieved.[6]

3. Legal framework and analysis
Federal Rule of Civil Procedure 60(b) allows a district court, in the exercise of its broad discretion, to modify a court decree when "it is no longer equitable that the judgment should have prospective application," Fed.R.Civ.P. 60(b)(5); see also Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 378-79, 112 S.Ct. 748, 757, 116 L.Ed.2d 867 (1992) (stating that Rule 60 is applicable to consent decrees). A party seeking modification of a consent decree in an institutional reform case "must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is *1011 suitably tailored to the changed circumstances." Id. at 393, 112 S.Ct. 748; Little Rock School Dist. v. Pulaski County Special School Dist., 56 F.3d 904, 914 (8th Cir.1995).
In this case, although enforcement of the consent decree would certainly be detrimental to the public interest in light of its present unconstitutionality, modification of the decree is not as "suitably tailored" to the changed circumstances as is its outright termination. Where the manifest racial imbalances have been eliminated, affirmative action consent decrees should be terminated. See Bhd. of Midwest Guardians, Inc. v. City of Omaha, 9 F.3d 677, 680 (8th Cir.1993) (noting that affirmative action consent decrees are not favored unless they "will terminate when the manifest racial imbalances have been eliminated" (punctuation omitted)). Clearly, that is the case here. The purpose of the consent decree was to keep the one-for-one hiring goal in place until either equal employment opportunity was assured for blacks or until racial parity was achieved.[7] Because the consent decree's remedial plan no longer addresses a compelling governmental purpose, modification is neither suitably tailored nor necessary.
Therefore, even the absence of a validated, job-related testing device for selecting fire privates cannot justify continuation of the consent decree. Accordingly, the consent decree, as adopted by this Court in City of St. Louis, 410 F.Supp. at 960-62, and as amended nunc pro tunc in City of St. Louis, 418 F.Supp. at 384-86, shall be dissolved.

B. Summary judgment motions
Deeken moves for summary judgment in seeking dissolution of the consent decree retroactive to 1993 or as void from its inception. Martinez moves for partial summary judgment on the substantive liability of the City.

1. Summary judgment standard
Summary judgment serves to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed.R.Civ.P. 56 advisory committee's note, cited in Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Summary judgment is appropriate only when the pleadings, depositions and affidavits submitted by the parties indicate no genuine issue of material fact and show that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).
The party seeking summary judgment must first identify grounds demonstrating the absence of a genuine issue of material *1012 fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Such a showing shifts to the nonmovant the burden to go beyond the pleadings and present affirmative evidence showing that a genuine issue of material fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586, 106 S.Ct. 1348. "They must show there is sufficient evidence to support a jury verdict in their favor." Nat'l Bank of Commerce v. Dow Chem. Co., 165 F.3d 602, 607 (8th Cir.1999). "Factual disputes that are irrelevant or unnecessary will not be counted," Anderson, 477 U.S. at 248, 106 S.Ct. 2505, and a mere scintilla of evidence supporting the nonmovant's position will not fulfill this burden, see id. at 252, 106 S.Ct. 2505.

2. Motion seeking retroactive dissolution
Deeken asserts that the Decree should be dissolved as void ab initio because the means chosen to remedy the City's unlawful discrimination was not narrowly tailored to "remedy the finding that the entry level examination had a disparate impact on blacks." Because the "narrowly tailored" requirement applies to a method for remedying effects of discrimination, rather than to remedy the fact of a disparate impact finding, and in light of the determination hereinabove that the one-for-one hiring requirement was narrowly tailored to remedy the past effects of racial discrimination against blacks by the City, Deeken's motion must be denied.
Alternatively, Deeken seeks dissolution retroactive to December 31, 1993. Deeken styled his primary motion for dissolution as a motion for summary judgment in which he relies on statistical data indicating that racial parity was achieved in 1993. Although such data shows that there is a question of fact regarding whether parity had been substantially achieved at the time, such data is subject to contradiction. Here, contradictory expert reports and analysis are in evidence which support a finding that parity was not achieved until as late as 2002. Therefore, in that evidence shows that a genuine issue of material fact exists as to the date on which dissolution of the consent decree became appropriate, and because a court must view the evidence and any inferences that may be drawn from it in the light most favorable to the nonmovant, Deeken's motion for summary judgment, insofar as it seeks dissolution as of 1993, must be denied.

3. Motion as to substantive liability of the City
Martinez asserts that the City is liable to Martinez as a matter of law for the effects of the City's failure to modify or terminate the consent decree in light of available statistical information which, in Martinez's view, shows conclusively that substantial parity was achieved well before the 1998 hiring process.
Martinez has not shown absence of a material fact as to the City's liability. In the first place, he has not shown that the City had a duty to move to dissolve the Decree. While it is true that the long-range hiring goal and remedial plan do not expire automatically, the City is not obligated to move to dissolve the consent decree. Moreover, had the City moved for dissolution, the mere availability of statistical information indicating that parity was achieved does not mean that parity had in fact been achieved. Indeed, the question of whether parity was achieved prior to the conclusion of the 1998 hiring process is a question of fact that is vigorously disputed. *1013 Therefore, Martinez's motion for partial summary judgment must be denied.

III.
Pursuant to the foregoing: Plaintiff Michael Martinez's Motion to Dissolve Partial Consent Decree (Doc. 69) is GRANTED; United States's Motion to Modify Consent Decree and Nunc Pro Tunc Order (Doc. 70) is DENIED; Intervenors' Motion to Join Motion of Plaintiff Martinez to Dissolve Partial Consent Decree (Doc. 71) is GRANTED; Plaintiff Deeken's Motion to [retroactively] Dissolve Consent Decree [Retroactive to December 31, 1993] and to Declare it Unconstitutional and Void [ab initio] (Doc. 72) is DENIED; Plaintiff Martinez's Motion for Partial Summary Judgment on the Issue of Substantive Liability of the City (Doc. 81) is DENIED.
So ORDERED.
NOTES
[1] E.D. Mo. Case Nos. CV 74-30C(1) and CV 74-200C(1).
[2] Where job performance requires abilities that many persons possess or can fairly readily acquire, "it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired," Hazelwood School Dist. v. United States, 433 U.S. 299, 307-08, 309 n. 13, 97 S.Ct. 2736, 2741-42 & n. 13, 53 L.Ed.2d 768 (1977). In 1976, black representation in the Fire Department was only 11 percent, as compared with black representation of 40 percent in the general population of the City of St. Louis. City of St. Louis, 588 F.2d 235, 237 n. 1 (8th Cir.1978) (noting stipulations of parties to 1974 dispute).
[3] Reports of the experts reveal a range of results regarding black representation within the City civilian labor force.

Dr. Bernard Siskin (the expert hired by the United States and whose findings have been adopted by the City) found that black representation among fire privates increased from 38 percent in the July-to-December 1991 time period to 45.3 percent by June 2002, and that black representation among fire fighters of all ranks increased by June 2002 to 43 percent. Using reports of the Bureau of Labor Statistics ("BLS") and the 2000 United States Census, Dr. Siskin estimates that in 2000, blacks comprised between 43.6 and 45.5 percent of the City's civilian labor force.
Dr. Cecilia Hegamin-Younger (the expert hired by plaintiffs Deeken and Martinez), relying on reports issued by the Missouri Department of Economic Development ("MDED") which estimates that in 1993, the City's civilian labor force was comprised of 41.1% blacks and that the percentage of blacks in the City's civilian labor force decreased to 40.7% in 2001, concluded that racial parity was reached at some point between 1990 and 1995.
[4] Applicants receiving scores between 70 and 100 on the written and physical components were considered for receipt of credit on the education and training component. In 1998, the education and training component included credit for possession of a paramedic or EMT license or completion of the required course work, an associates degree or certificate of proficiency in Fire Protection Technology or Fire Science, or a Firefighter I or II certificate (maximum possible score of 24). In 2001, if the applicant had an EMT-paramedic license, he received a score of 100 on the education and training component; if the applicant did not have such a license, he received a score of 70.

The converted score on each of the three components were based on the raw scores received by each candidate. Those raw scores were then converted into a composite score. A composite score between 70 and 100 constituted a passing score.
[5] On April 11, 2003, the Court entered a temporary restraining order prohibiting the City from hiring on the basis of the 2001 test, which order was extended indefinitely to a future date to be set by the Court after consultation with the parties. Order of April 21, 2003.
[6] F.I.R.E. does not concede that racial parity has been achieved. F.I.R.E. argues that racial parity should be defined by comparing black representation in the fire private ranks with black representation in the City's overall civilian population.
[7] Paragraphs 2, 5 and 6 of the original consent decree, as adopted in paragraphs 1, 4 and 5 of the Nunc Pro Tunc Order of June 28, 1976, provided:

[D]efendants [the City] shall adopt and seek to achieve a goal of hiring blacks for at least fifty percent (50%) of the vacancies for the entry level of Firefighter personnel ... during the life of this decree.... [T]he use of any written screening device shall not be a defense for failure to meet the interim hiring goals....
....
If the defendants wish to use written examinations for qualifying or ranking applicants ... in a manner inconsistent with the [hiring goal], any such written examination must have been found to be job-related and validated by a criterion related study ... or otherwise have been shown to have no discriminatory impact.... If the parties disagree [regarding lack of adverse impact or validation of test], the examination shall not be utilized unless and until the Court determines upon motion and such evidentiary hearing as it deems appropriate that the test has no adverse impact, or that it has been validated in accordance with Title VII ....
City of St. Louis, 418 F.Supp. at 384-85.